## LAUGHLIN v. MAGNOLIA PETROLEUM CO.

### No. 1866.

Court of Appeal of Louisiana. First Circuit.

June 14, 1938.

Griffin T. Hawkins and J. J. Tritico, both of Lake Charles, for appellant.

Liskow & Lewis, of Lake Charles, for appellee.

OTT, Judge.

Plaintiff sues for compensation in the sum of $8,000, being the maximum of $20 per week for 400 weeks for the loss of the sight of both eyes, plus medical expenses of $250. His cause of action is set forth in Article 4 of his petition as follows:

"That for approximately ten years prior to May 28th, 1936, your petitioner was in the employ of the Magnolia Petroleum Company doing manual labor in firing furnaces and boilers for the said company, and while working within the scope of his employment during this period, his eyesight became impaired from the extensive amount of heat given off from the furnaces and boilers which were fired by the petitioner herein for the said Magnolia Petroleum Company, and especially on May 28th, 1936, his sight was finally lost, the resultant consequences being the total loss of his eye-sight, from the glaring heat being given off by the above mentioned furnaces and boilers."

The defendant filed an exception of no cause or right of action, which was overruled. As this exception is not pressed in this court, and as the conclusion which we have reached in the case renders it unnecessary for us to discuss the exception further, we will give it no consideration.

Defendant admits that plaintiff was in its employ on the date he claims to have been injured, but denies that he suffered any compensable injury as alleged in the petition. Further answering, the defendant alleges that it had no notice of the alleged injury and had no knowledge of it within 6 months after it is alleged to have occurred. In the alternative, defendant averred that plaintiff received payments under its gratuitous benefit system for non-compensable disabilities amounting to $674.70, and as he had voluntarily applied for and received these benefits, he is now estopped from claiming that his injury is compensable; and, pleading further in the alternative, the defendant alleges that if the court finds that plaintiff is entitled to compensation, that it should be permitted to deduct the amount paid under these sick benefit payments.

Judgment was rendered by the trial court rejecting the demands of the plaintiff, and he has appealed from that judgment.

There is no question but that plaintiff is blind in both eyes, at least to the extent of rendering him disabled from pursuing

his occupation. The medical testimony is unanimously to the effect that the blindness is caused from atrophy of the optic nerve. The serious and only question in the case is whether or not the atrophy of the optic nerve was caused from an "accident" arising out of and in the course of plaintiff's employment within the terms and meaning of the compensation law, Act No. 20 of 1914, particularly Section 38, as amended by Act No. 38 of 1918, § 1, which section reads as follows:

"The word 'Accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury. The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom. The said terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."

The evidence shows that some 5 or 6 years before plaintiff claims to have sustained the injury resulting in his blindness, he was treated at his request for syphilis by Dr. Marshall, at which time plaintiff complained of his eyes. The treatment was not completed as plaintiff did not return to finish it. There is other evidence to show that plaintiff had been troubled with his eyes for some time before he lost his sight entirely. In January, 1936, a few months before the alleged injury, he consulted Dr. Moody for treatment of his eyes. At that time Dr. Moody found that plaintiff's vision was only about one-fifth of normal, but, according to Dr. Moody, plaintiff's sight was restored after treatment.

Plaintiff gives the following account of the occurrence which he claims resulted in the loss of his sight:

"When I went to work that morning at 7 o'clock I had normal eyesight, I thought, and I fired up this boiler to put it on the header line with the other boiler, and about 10 o'clock or 10:30, some time along there, the boiler was just about ready to cut into the line, the boiler was smoking and I went over there to adjust the fire, and when I stooped over to adjust the fire shooting pains hit me in the eye. I paid no attention to it at the time, and when I got my fire adjusted I straightened up and when I did I had no eyesight left, I was blind."

Further on in his testimony, in answer to questions propounded by the court, plaintiff said:

"Q. At the time you were adjusting these valves, or at the time you said you became totally blind, was there anything unusual of any character around the fire box or around the boiler or anything that was out of the ordinary? A. No sir, only this fire was smoking and I went to adjust the fires and cut the smoke out.

"Q. Did the smoke get in your eyes, or did a tongue of flame come out and strike you in the eyes? A. No sir, it was just a beaming heat.

"Q. Was that the ordinary heat that you experienced every day when you were firing those boilers? A. Yes sir, I guess it was.

"Q. The heat that came out was not extraordinary in any way? A. No sir.

"Q. Did you strike your forehead or eyes on anything? A. On the target there is a target in those boilers—made out of brick, and I focused my fire on that target, I was there probably four or five minutes looking at that flame and that target.

"Q. But your body itself came in contact with nothing except your hand working the valve, isn't that correct? A. That's right."

And still further on in his testimony, plaintiff testified as follows:

"Q. You've possibly looked in that fire box thousands of times in the course of your employment, have you not? A. Yes sir.

"Q. And according to your testimony here nothing more happened on the last day you worked than happened the other times? A. I don't know of anything really happening."

While plaintiff states that he told defendant's office man, who was in charge of reports, that he "went blind" on the last day he worked, yet the preponderance of the evidence shows that plaintiff made no complaint of any unusual occurrence on that day, nor did he claim that he had sustained an accident. Moreover, he applied for and received the disability benefits provided by the company for employes to cover sickness or disability not coming under the compensation law until the suit was filed some 11 months after the alleged accident.

An examination of plaintiff was made in July, 1937, by Dr. Holcombe, and he found that plaintiff was then suffering from an advanced stage of neuro syphilis, involving the optic nerve. A Wassermann test showed positive, with a spinal degeneration as the outstanding entity in the case. There were also evidences of myo-carditis, chronic nephritis, locomotor ataxia, high blood pressure and atrophy of the optic nerve.

The medical evidence shows that syphilis is the principal cause of atrophy of the optic nerve, although it is not the sole cause. The evidence also shows that plaintiff had been affected with a syphilitic condition for several years before he claims to have lost his eyesight, and, according to his petition and the evidence in the case, his sight had been impaired for several years.

It is almost the unanimous opinion of the medical experts that heat and glare, without some severe burns around the eyes, would not cause atrophy of the optic nerve. And the preponderance of the medical testimony further shows that heat and glare in firing a boiler would not affect or aggravate the syphilitic condition insofar as it relates to the optic nerve. Characteristic of the answers of four or five experts on this point, one of whom was called by plaintiff, we quote from the testimony of Dr. Olin W. Moss:

"Q. In your opinion would the condition have been aggravated in any way by the plaintiff having been subjected to heat or glare over a number of years such as the heat or glare from an oil field furnace, still assuming that the syphilitic condition was there? A. I don't think it would have any bearing.

"Q. Irrespective of whether the plaintiff has syphilis or not, do you think that the heat or glare from the oil field boilers could cause or aggravate this condition? A. I don't think so.

"Q. Isn't it true, Doctor, that heat causing atrophy of the optic nerve would have to be so severe that it would have to burn the head or eye severely before the nerve could be killed? A. Yes."

■ Of course, if the glare and heat from the boiler or furnace served to activate, aggravate or hasten the atrophy of the optic nerve because of the weakened condition of the nerve brought on by syphilis, and if this heat and glare on that particular day was unusual and out of the ordinary routine of the day's work, it could be said that the heat and glare from the boilers had a causal connection with the blindness, and plaintiff would be entitled to compensation. Jackson v. Travelers' Ins. Company et al., 180 La. 43, 156 So. 169; Renfrow v. Caddo Parish Police Jury et al., La.App., 155 So. 291.

■ But it will be observed that in the cited cases, and other similar ones, that there was something in the happening that contributed in some way to activate or aggravate the latent disease, and hasten the effects of the disease because of the weakened condition of the body or the organ affected. But in the present case, the decided preponderance of the medical evidence shows that, regardless of whether plaintiff was suffering from a syphilitic condition, the usual heat and glare from the boilers could have had no effect on his sight without some unusual and severe heat sufficient to cause trauma over the eyes. We must rely on the medical evidence on questions of this kind where that evidence is practically unanimous as it is in this case.

■ Shortly after he completely lost his eyesight, plaintiff voluntarily consulted Dr. Girrard, an oculist and aurist of Lafayette, and this specialist treated him for about a year. Plaintiff's counsel insists that the opinion of this specialist who treated plaintiff over a period of several months should be given more weight than that of the other specialists who only examined him once or twice. Even so, plaintiff can get little help from the opinion of this specialist as he states several times that he does not know what caused the atrophy of the plaintiff's optic nerve. About all that he says on this point is that he does not know whether it was caused from intense light, heat or the syphilitic condition.

Not only does the evidence, medical and otherwise, fail to show with reasonable certainty that the atrophy of the optic nerve was caused by the heat and light to which plaintiff was subjected when firing the boilers, or that this heat and light aggravated and superinduced the syphilitic condition so as to hasten this atrophy, but it rather shows that the atrophy of the optic nerve and the resulting blindness was caused from the syphilitic condition; that this condition caused the blindness, independently of the exposure of plaintiff to the heat and light of the boilers.

Allowing the most liberal construction of both the compensation law and the evidence in the case in favor of plaintiff, he has still failed to show that his present blindness was caused or superinduced by an accident or injury in the course of his employment. We find no error in the finding of the trial judge on this point.

Any person afflicted with blindness and disease as plaintiff appears to be appeals to the sympathy of any court, but we must interpret the law as it is written and as it applies to the facts in this case, and we are not justified in bending our interpretation of the law or in misconstruing the medical testimony in order to afford plaintiff financial relief.

For the reasons assigned, the judgment is affirmed.